UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Eastern Division                                        Case No. _____

```
_____
                                    )
LISA STATZ,                         )
        Plaintiff,                  )
                                    )
vs.                                 )
                                    )
INTEGRATED DERMATOLOGY GROUP, LLC   )
 and MARK S. AMSTER, M.D.,          )
        Defendants.                 )
_____ )
```

# Complaint and Demand for Jury Trial

## INTRODUCTION

Plaintiff Lisa Statz ("Plaintiff" or "Ms. Statz") brings claims for sex discrimination, pregnancy discrimination, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and as amended by the Pregnancy Discrimination Act of 1978, M.G.L. c. 151B, §§ 4(1), 4(1E), 4(11A), 4(4) & 4(4A), the Massachusetts Parental Leave Act, M.G.L. c. 149, § 105D, the Pregnant Workers Fairness Act, M.G.L. c. 151B, § 4(1E), and tortious interference with contract.  Ms. Statz's claims arise out of acts of her former employer, Defendants Integrated Dermatology Group, LLC ("IDG"), and Mark S. Amster, M.D. ("Dr. Amster") who subjected her to sex discrimination and harassment on the basis of her pregnancy, and retaliation after she complained about pregnancy discrimination.  After she was constructively terminated from her employment by Defendants, Dr. Amster intentionally interfered with her efforts to find subsequent employment.

## PARTIES

1

1.      Plaintiff Lisa Statz is an adult resident of the Commonwealth of Massachusetts, who resides at 7 Howe Street, Hingham, Plymouth County, MA 02043.

2.      Defendant Integrated Dermatology Group, LLC is a private corporation with a principal office located at 4700 Exchange Court, Suite 110, Boca Raton, FL 33431.  Corporate Creations Network, Inc., located at 10 Milk Street, Suite 1055, Boston, MA 02108 is listed as the Resident Agent of Defendant IDG as set forth in the records maintained by the Secretary of State for the Commonwealth of Massachusetts.  IDG's principal place of business in Massachusetts is its office located at 280 Washington Street, Suite 212, Brighton, Suffolk County, MA 02135 as set forth in the records maintained by the Secretary of State for the Commonwealth of Massachusetts.

3.      Dr. Amster is an adult resident of the Commonwealth of Massachusetts who resides at 70 Collins Road, Waban, Middlesex County, MA 02468.  Dr. Amster is a licensed dermatologist who is a member or manager of the medical practice that is owned by IDG, d/b/a Integrated Dermatology of Newton-Brighton, which has a principal place of business at 280 Washington Street, Suite 212, Brighton, Suffolk County, MA 02135, as set forth in the records maintained by the Secretary of State for the Commonwealth of Massachusetts.  Integrated Dermatology of Newton-Brighton has an office at 800 Falmouth Road, Suite 101B, Mashpee, Barnstable County, MA 02649.

## JURISDICTION

4.      Plaintiff timely filed her claims with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC").  Plaintiff removed her claims from the MCAD and received a right to sue letter from the EEOC to file her claims in Federal Court.

5.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 based on a federal

      question over the claims raised under 42 U.S.C. § 2000e et seq. This Court has

      supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims raised under

      M.G.L. c. 149, § 105D, M.G.L. c. 151B and the tort claim.

                                 **FACTUAL ALLEGATIONS**

6.    Ms. Statz is a certified Physician Assistant (PA-C) practicing exclusively in dermatology.

      She received her Masters in Physician Assistant Studies from Northeastern University in

      2016, where her clinical rotations included both private practices as well as large teaching

      hospitals including Massachusetts General Hospital and Brigham & Women's Hospital.

      After earning her Master's degree, she worked at the Dermatology Institute of Boston

      from November 2016 to May 2018 as a Physician Assistant where she delivered both

      medical and cosmetic dermatology care.

7.    In March 2018, Ms. Statz spoke with a recruiter from IDG, Dan Schueller, about the

      possibility of joining IDG's practice in its Cape Cod office in Mashpee.  She told the

      recruiter that her relationship with the supervising physician was paramount and needed

      to be a true partnership.  She told the recruiter that she was looking for a practice in

      which she would have a dedicated Medical Assistant (MA) and dedicated rooms.  She

      said she wanted to continue practicing both medical and cosmetic dermatology.  Mr.

      Schueller assured Ms. Statz that she would have 1 or 2 dedicated MAs, enough patient

      rooms and the support she needed, and would be able to practice cosmetic as well as

      medical dermatology.

8.    On April 2, 2018, Ms. Statz was interviewed by Dr. Amster for the position of Physician

      Assistant in his Mashpee office, where he worked one day a week (Wednesdays).  He

                                              3

was looking for a PA who could work on the days he was in that office, and also to cover other days when he worked out of his main office in Brighton.  Dr. Amster told Ms. Statz that he was looking for someone who would be the lead PA, could grow the practice and lighten his patient load.  Ms. Statz told him that she wished to introduce and develop a cosmetic dermatology practice.  He told her "you can do whatever you want with regards to cosmetics."  He also told her "there is a huge unmet need for both medical and cosmetic dermatology on the Cape."  Dr. Amster also assured Ms. Statz that she would have a dedicated MA and dedicated patient rooms, probably 2 dedicated rooms to start.

9.      On April 4, 2018, Mr. Schueller sent Ms. Statz an email with information explaining how IDG would calculate her earnings based on the expected hours she would be working and the expected reimbursements for her services.  He told her that she would be paid 30% of collections from her services.  He calculated that Ms. Statz could earn between $162,432 and $221,990 working three days a week, seeing four patients an hour, working eight hours of patient time a day (i.e., 32 patients a day), based on reimbursements ranging from a low of $120 to a high of $164.  **See Exhibit A hereto**.  Dr. Amster confirmed that with the number of patients that he expected Ms. Statz would be seeing, she could earn between $160,000 and $220,000 a year.  Her employment agreement guaranteed her a draw of $87,000, plus 30% of collections over that amount.

10.     Based on these promises, including the fact that Ms. Statz would have the opportunity to build a cosmetics practice from the ground up and be the lead PA in the practice with a dedicated MA, she agreed to take the job.  Ms. Statz signed her contract on April 26, 2018. She and her husband decided to sell their apartment in the Back Bay in Boston and

move to the Cape to be closer to Ms. Statz's new job.  Ms. Statz was due to begin her job with IDG in July.

11.   On May 18, 2018, Ms. Statz learned to her complete surprise that she was pregnant. This came as a shock because she had never become pregnant before without going through invitro fertilization.  It took three rounds of IVF for her to become pregnant with her twin boys.

12.   On June 3, 2018, Ms. Statz received a text message from Dr. Amster about ordering cosmetic dermatology supplies.  She responded, "sounds great. See you Wednesday!" Ms. Statz was pleased that Dr. Amster was getting ready to order supplies so that she could begin developing a cosmetics practice when she started her job a month later.

13.   On June 19, 2018, Dr. Amster sent a letter introducing Ms. Statz to referring physicians in the area in which he stated that she would "see patients for medical and cosmetic dermatology."  The letter adds: "Additionally, Lisa customizes cosmetic treatments to help patients achieve a more youthful, rested and natural appearance.  Lisa is a trained Botox® injector, a Certified Coolsculpting® provider and a trained Vi Peel® practitioner."  The letter ends by saying, "She is accepting new patients."  **See Exhibit B hereto**.

14.   Ms. Statz's first day of work was Wednesday, July 11, 2018.  Ms. Statz was scheduled to work Tuesdays, Wednesdays and Thursdays.

15.   Throughout her employment, Ms. Statz reported to Dr. Amster, who worked in the Mashpee office on Wednesdays. When he came to the Mashpee office on Wednesdays, Dr. Amster brought with him the Practice Manager, Neeru Peterson, and several dedicated Medical Assistants who supported Dr. Amster.

16. On her first day of work, Ms. Statz had 16 patients on her schedule. Ms. Statz was told that the MA who lived nearby on the Cape would be her dedicated MA.

17. On her first day of work, Ms. Peterson tried to show Ms. Statz how to use the electronic medical record system Caretaker. Ms. Statz had never used that system before and the instructions were confusing. Ms. Statz overhead Ms. Peterson and Dr. Amster say that they used a different electronic records system, EMA, in their Brighton office. Having used EMA before, Ms. Statz asked if she could use EMA and was told that she could.

18. On July 12, 2018, Ms. Statz sent an email to Ms. Peterson, requesting supplies including topical lidocaine/anesthetic and other supplies necessary for administering Botox and other cosmetic procedures. Ms. Peterson told her that she would take care of it.

19. When she first started her employment, Ms. Statz's work environment was positive. She felt welcomed and supported. She was given a dedicated MA and people were supportive of her as she learned the office routines and her new job.

20. By late July, 2018, Ms. Statz felt that her pregnancy was far enough along that she felt safe to tell people that she was pregnant. On July 25, 2018, Ms. Statz told Dr. Amster that she was pregnant. The look on his face showed that he was clearly not happy with this news. He asked if Ms. Statz was coming back to work after having the baby and she assured him that she was. She also assured him that she had not known that she was pregnant at the time she interviewed for and accepted the position and that, in fact, she was as surprised as he was that she was pregnant at all given her history, which she shared with him.

21.     After informing Dr. Amster of her pregnancy, Dr. Amster's attitude and demeanor
        towards Ms. Statz changed, as did the attitude and demeanor of the Practice Manager,
        Ms. Peterson.

22.     After informing Dr. Amster that she was pregnant, Ms. Statz never received the cosmetic
        dermatology supplies.  She also asked for other supplies including a microscope,
        eyeshield, safety goggles, slides, and mineral oil, yet those requests were also ignored
        despite the fact that she followed up several times to ask about the status of her request
        for supplies.

23.     Ms. Statz was never given the level of patients that Dr. Amster and the recruiter promised
        when she was interviewing for the job. They had told her she would be able to see 4
        patients an hour over an 8-hour day, which would average 32 patients a day.  In the July
        to December 2018 period, prior to going on maternity leave, Ms. Statz was only
        scheduled to see patients less than half of the days she was available.  On average she
        saw only about 7 patients a day instead of 32.

24.     Sometimes Ms. Statz would show up at work and find that patients that had been on her
        schedule were cancelled.  Other times her days were cancelled all together.  Ms. Statz
        never once saw enough patients in a week to even reach her guaranteed salary level,
        much less earn anything over that amount, and nothing close to the minimum goal of
        $162,000 annually.  This meant that she was earning only about half of what she had
        been promised.  On most Tuesdays and Thursdays, when Dr. Amster was not in the
        Mashpee office, Ms. Statz had few patients on her schedule.  She learned later that one of
        the Medical Assistants was told to move her patients from Tuesday and Thursday to
        Wednesday when Dr. Amster could see them or put them off to a future appointment.

25.     Ms. Statz and her husband sold their Boston apartment, which closed on August 1, 2018, incurring realtor fees of $49,000.  They moved all of their belongings to the Cape on July 27, 2018, at a cost of $4,400.50.

26.     On September 4, 2018, Ms. Statz sent Dr. Amster and Ms. Peterson an email regarding her plans for maternity leave, saying she planned to be out January and February 2019 on leave and would return to work on March 5, 2019.  Neither of them responded to this email.

27.     On September 6, 2018, Ms. Statz followed up with Ms. Peterson about her request for supplies related to cosmetic dermatology.  Ms. Peterson responded by saying she would order a refrigerator the following week, but that never happened.

28.     On September 24, 2018, Ms. Peterson emailed Ms. Statz telling her that her MA would not be available to her and that instead the Administrative Assistant who was not medically trained would be rooming Ms. Statz's patients that day.  That meant that Ms. Statz was all alone with no trained medical support. From that time forward, on most Tuesdays and Thursdays, Ms. Statz did not have a Medical Assistant despite the fact that she had been promised she would have a dedicated MA.  The Administrative Assistant was often the only person available to assist her.  It could be dangerous not to have a trained MA who knows how to perform routine medical tasks as, for example, there could be a risk of needle stick injury.

29.     Ms. Statz was on vacation the following week. When she returned from vacation, on Tuesday October 2, 2018, Ms. Statz texted her MA and asked what time their first patient was scheduled. The MA told her that she was not going to be supporting Ms. Statz that day as the practice had asked her to go to the Brighton office. Ms. Statz asked her what

time the first patient was scheduled, and the MA said she did not think Ms. Statz had any patients scheduled.  This MA told Ms. Statz at a later date that she (the MA) had been directed to switch patients off of Ms. Statz's schedule.

30.   On November 4, 2018, Ms. Statz talked to Dr. Amster about the poor communication and lack of support in the office and the fact that so many of the things that had been promised at the time she was hired had never materialized.  She said without having her dedicated MA, and instead just having the Administrative Assistant who is not medically trained available to her meant she was not able to operate at full capacity.  She asked again to have her dedicated MA back so that she could work as efficiently as possible. She told him that she felt that the lack of support she had been receiving, the lack of communication, the lack of her dedicated MA, the lack of supplies despite her requests, the low number of patients, and the failure to allow her to develop a cosmetic practice felt retaliatory because she was pregnant and going on maternity leave.  During that telephone conversation, Dr. Amster told her that it did not make sense for her to start developing a cosmetic practice in November since she would be going on maternity leave soon.  She pointed out that she could have started developing that practice back in July had she been supported.  He assured her that he would allow her to develop a cosmetic practice after she returned from maternity leave.  He also said she could have her MA back, but then the following week changed his mind.

31.   Because of how Dr. Amster and Ms. Peterson were treating her, Ms. Statz dreaded coming to the office on Wednesdays when Dr. Amster and Ms. Peterson would be there.

32.   On Wednesday, December 12, 2018, Ms. Statz started having abdominal pain and contractions.  She was extremely uncomfortable, but was afraid to say anything to Dr.

Amster or Ms. Peterson.  Ms. Statz was able to see all but her very last patient of the day, and after finally calling her ObGyn, she told Ms. Peterson that her ObGyn was sending her to the hospital.  She was seen in the labor and delivery unit for several hours that day. Two days later, on Friday, December 14, 2018, Ms. Statz was hospitalized at Mass General Hospital.

33. Ms. Statz was scheduled to work the week of December 17 to 21, 2018, and to be on vacation the following week, beginning her maternity leave on Tuesday, January 2, 2019. However, Ms. Peterson told her she would not be able to see patients that week, claiming that because Dr. Amster was not working that week, there would be no support staff and so she would also not be scheduled to work.  Ms. Statz was ready and able to come to work, but was told not to come in.  IDG paid Ms. Statz for that time, but later claimed that because she did not work that week she should not have been paid (even though she was a salaried employee), and they were considering this to be the start of her maternity leave.

34. Ms. Statz had her baby girl on January 10, 2019.  She was on maternity leave from January 2 to March 4, 2019.

35. During her maternity leave, Ms. Statz learned from one of her coworkers that Dr. Amster had said he was not happy that she had been pregnant and spoke about her as though she was not coming back from maternity leave, and spoke of the future of the practice without Ms. Statz a part of it.  What the coworker shared was confirmed when Ms. Statz later learned that Dr. Amster went through the process of hiring a new PA to replace her while she was on maternity leave.

36.     On January 31, 2019, Dr. Amster sent Ms. Statz an email saying he had decided that he would not have cosmetic dermatology as part of the practice, claiming a lack of staff and space.  Yet there was no change in the staff or space from when she was hired and when Dr. Amster had assured her in November 2018 that he would allow Ms. Statz to begin developing a cosmetic dermatology practice after her maternity leave.

37.     On February 18, 2019, the Credentialing Manager emailed Ms. Statz regarding the need to renew her state license, which was due to expire on March 1, 2019.  On February 20, 2019, Ms. Statz emailed the Credentialing Manager and Ms. Peterson about getting reimbursed for her license renewal as guaranteed in her contract, and requesting the proper documentation forms to do so.

38.     On February 22, 2019, the Director of Human Resources Tom Pflepsen emailed Ms. Statz to tell her that she owed IDG $2,854.42 for being overpaid the week of December 17-21, 2018, claiming that her last day of work was December 12, 2018 and that she began her maternity leave after that.  Ms. Statz emailed him back to explain that she was available to work that week, but was asked not to come in because Dr. Amster was away and no patients would be scheduled. She explained that she took vacation the following week and did not begin her maternity leave until January 2019.

39.     Having heard nothing about her request to get information about reimbursement for her licensure fee, on March 1, 2019, Ms. Statz paid the $450 to renew her license ($150 to the Commonwealth of Massachusetts and $300 to the national certifying board, NCCPA). She was never reimbursed for this expense nor did Ms. Peterson ever respond to her email requesting the procedure to submit for reimbursements.

40. Ms. Statz returned from maternity leave on Tuesday, March 5, 2019 as she said she would.  She met a new Medical Assistant, who greeted her with a hug, telling Ms. Statz that she had heard wonderful things about her from her patients and that her patients had been asking about her.  The new MA also told her they had hired a new PA.

41. Ms. Statz had only 7 patients on her schedule the day she returned from maternity leave. The next day, Wednesday, March 6, 2019, she had 16 patients scheduled, while Dr. Amster saw 71 patients.  The following day, Thursday, March 7, 2019, Ms. Statz had only 2 patients on her schedule.

42. On March 5, 2019, Ms. Statz emailed Ms. Peterson asking if she could take vacation April 16-18 when her twin boys would be on school vacation.  Even though Ms. Statz only had three patients on her schedule for that entire school vacation week, her request was denied on March 10, 2019, on the basis that Dr. Amster would be out that week and would need coverage. This was in direct contrast to what happened December 17-21, 2018, when Ms. Statz was forced out of work for the week because Dr. Amster was away.

43. On Wednesday, March 6, 2019, which was Ms. Statz's first day working with Dr. Amster following her maternity leave, Dr. Amster did not acknowledge Ms. Statz when she said hello to him.

44. On March 11, 2019, Ms. Statz sent Dr. Amster an email outlining her concerns including that she believed she was being treated poorly and pushed out of the practice because of her pregnancy.  She wrote:

    Hi Mark,

I'm concerned about the direction our professional partnership, as a PA and supervising physician, is taking and I would like for us to repair the damage before this spirals out of control.

When I returned to work last Wednesday, I walked in the room and you didn't even acknowledge me, much less ask how I was, how my new baby was doing or even welcome me back.  There was a chill in the room. I felt so uncomfortable, unwanted and unappreciated.  I continued to feel, for the rest of the day, that you had wished that I hadn't returned from maternity leave.  I really don't know what I have done to disappoint you or upset you.  I love my job as a dermatology PA and I absolutely love our patients.

I have felt anger and resentment from you since I told you I was pregnant, my first week at work.  While I know that was not ideal for the business or the practice, it is my right to have children as a working woman and I am not supposed to be made to feel bad about it or unwanted in my position, nor is it cause to change the terms of our contractual agreements.

I was hired to practice both medical and cosmetic dermatology.  I was promised Botox on day 1 and not only has this continued to be delayed, but you also sent me an email on my maternity leave informing me that you didn't intend on beginning cosmetics in the practice, after I was promised we would start after my maternity leave.  Again, I feel this is another attempt to upset me and push me out of the practice. Lastly, I sent a request to Neeru for vacation days April 16-18, which as you know is Spring Break for most children in Massachusetts. I was sent an email by Neeru yesterday denying this request as you were going to be out and that there are already patients on my schedule. Again, I feel like the terms of our agreement are being changed without informing me first. When you and I sat down for my interview, you emphasized your focus on family telling me that you take a week of vacation every month and that I can do the same.  Now, I do not intend on taking a week of vacation every month, but when my children are on break, it is necessary.  At the very least, I should be informed of the change.

I want to work for you.  I want to learn from you. I want to strengthen our partnership, but I also want to enjoy coming to work.  Do you still want me to work alongside you or are you hoping that I will leave? I hope we can work through all of this and do what is best for the practice and for our patients.

Sincerely,
Lisa

**Exhibit C hereto.**

45.    The next day, March 12, 2019, Ms. Statz had only one patient scheduled, but actually saw

no patients.

46.    On March 12, 2019, Ms. Statz met the new PA, who visited the office.  Ms. Statz was

surprised that a new PA would be hired given the fact that IDG had been unable to fill

Ms. Statz's schedule with patients since the start of her employment in July 2018. The

new PA was surprised to see Ms. Statz.

47.    On March 20, 2019, Dr. Amster responded to the email Ms. Statz sent to him on March

11, telling her he did not have the staffing, space or proper coverage to incorporate

cosmetic dermatology into the practice.

48.    After the new PA began working, Ms. Statz found that patients that had been on her

schedule were switched to the new PA.  For example, on March 24 Ms. Statz saw that she

had 25 patients on her schedule for March 27, whereas the new PA had very few patients

on that date.  But then when Ms. Statz checked the schedule on March 26, she saw that

she had only 11 patients scheduled for March 27, while the new PA had 34 patients

scheduled.

49.    On March 26, 2019, a patient told Ms. Statz that she saw an ad in the newspaper, the

Cape Cod Times, introducing the new PA and thought that Ms. Statz was no longer in the

practice.

50.    On March 27, 2019, Ms. Statz's schedule was down to 11 patients and the new PA had

34 patients.

51.    On March 27, 2019, Stuart Sands, an owner of IDG who heads Practice Operations, came

up from IDG's headquarters in Boca Raton, Florida to the Mashpee office.  He asked to

speak to Ms. Statz, saying he had read the emails between her and Dr. Amster and wanted to hear what Ms. Statz had to say. This was the first time she had ever met or spoken with Mr. Sands.  Ms. Statz told him that she felt she had been retaliated against because of her pregnancy.  She told him that she had not known she was pregnant when she interviewed and accepted the job, but that she had a right to have a baby and return to work.  Ms. Statz told him that many things had been promised to her that never materialized including the number of patients she would see, having a dedicated MA, being able to develop a cosmetic dermatology practice, and what her potential earnings would be.  She told him that they were moving her patients off of her schedule to the new PA.  At the end of this meeting, Mr. Sands said to her, "I'm going to be blunt here. What would it take for us to part amicably?"  She asked him, "Is that why we are here," to which he responded, "My sense of the situation is that it is beyond repair."

52.     The next day, March 28, 2019, at approximately 1:35 p.m., a patient walked in saying he was there to see Ms. Statz, but was told he would be seeing the new PA.  Even though he looked at his appointment card and said he was there to see Ms. Statz, he was given to the new PA who saw several other patients of Ms. Statz that day.

53.     On April 2, 2019, Mr. Sands called Ms. Statz at about 9:00 a.m. and said he would be in the Mashpee office in 15 minutes and wanted to meet with her.  When the meeting began, Mr. Sands put the Director of Human Resources, Tom Pflepsen, on speaker phone.  Mr. Sands began the meeting saying there had been issues with Ms. Statz's performance going back to November.  This was the very first time anyone had ever said there were any issues with Ms. Statz's performance.  He presented her with a Discipline Documentation Form and asked her to sign it, which she refused, saying that none of the

complaints were true.  Ms. Statz felt she was being ambushed.  He then offered her four months of severance to leave the practice.  He handed her a Separation Agreement, that contained the offer of four months of severance if she would release claims against IDG and leave the practice.  She refused. She told him that all of this was making her feel very uncomfortable and that it was clear retaliation for her bringing to IDG's attention that she was treated unfairly for being pregnant and taking maternity leave.  Ms. Statz was shaking as she stood up to leave and holding back tears.  As she left the room, she told Mr. Sands that if he has a mom, a sister, or a daughter, she hoped that they would never be treated this way.

54.   On April 4, 2019, the new PA told Ms. Statz that Dr. Amster has asked patients on his schedule if they would like to see the new PA.

55.   On April 4, 2019, Ms. Statz responded in writing to the written warning, pointing out that this was the first time these claims were being made and that she considered the discipline to be retaliation for complaining about how she was treated because of her pregnancy and maternity leave. She said she felt they were trying to drive her out of the practice.

56.   On April 9, 2019, the new PA and Ms. Statz received a microscope for their use.  This was just a week after the new PA requested it.  This was 8-9 months after Ms. Statz had requested one.

57.   Over the next two months Mr. Sands and Dr. Amster continued to criticize Ms. Statz and try to find fault with her performance.  She was now being scrutinized in everything that she did so that they could find an excuse to fire her for performance reasons.

58.    On April 11, 2019, Dr. Amster sent Ms. Statz an email telling her that going forward, she

had to use a different medical records system (Caretracker) than the one she had been

using (EMA) since she began her employment in July 2018.  He required Ms. Statz to use

Caretracker without adequate training, knowing that the system did not work well on a

Mac (which she used), and despite the fact that he himself did not actually have to use the

system, but routinely dictated his notes to a person in India (Jasmine), who entered his

notes on the system. By contrast, Ms. Statz was not allowed to dictate her notes to

Jasmine.  Instead of allowing Ms. Statz to dictate her notes, she had to prepare individual

Word documents for each of her patients, which took many hours of time and posed a

significant risk of making errors.  This was not good for the patients. By contrast, the

EMA system that Ms. Statz had been using since her employment began, was extremely

efficient, secure, and allowed her to enter her notes in a matter of minutes as she finished

up with each patient.  In order to create Word documents to use with Caretracker, Ms.

Statz had to start coming in to the office on Fridays or work late just to get the notes

completed.  It was no surprise that she began to fall behind on completing her notes,

which Dr. Amster used as an excuse to claim she was not adequately performing her job.

Forcing Ms. Statz to use Caretracker, an antiquated system, was intended as a way to set

Ms. Statz up to fail or force her to resign.

59.    On April 12, 2019, Ms. Statz received a letter from Mr. Sands again criticizing her

performance, claiming her attitude and behavior was "unacceptable" and questioning

whether she wanted to continue working for IDG.

60.    Frustrated and recognizing that her efforts at trying to resolve the situation internally

were getting nowhere and fearing that her job was at risk, Ms. Statz hired an attorney to

help her protect her job. Only after Ms. Statz's attorney communicated with IDG early on the morning of April 16, 2019, were patients switched back from the new PA to Ms. Statz's schedule.

61.     Later on the morning of April 16, the new PA told Ms. Statz that she had just been told that she would be let go.  She also shared with Ms. Statz that when she was being hired, Dr. Amster had told her that she was being hired to replace a PA whom Dr. Amster hoped would quit or would not return from maternity leave.

62.     On Tuesday, April 23, Ms. Statz saw that patients were being switched from the new PA to her schedule.  On Wednesday, April 24, the new PA was told at the end of the day that this was her last day of work. Even though the new PA was let go and patients were switched back to Ms. Statz, Ms. Statz was not provided the dedicated MA that the new PA had been provided.

63.     Over the next month, multiple attempts were made to set Ms. Statz up to fail or to quit.  A significant change in the terms and conditions of Ms. Statz's employment was that Dr. Amster required Ms. Statz to start using the Caretracker medical records system which she had never had to use since she began her employment in July 2018.

64.     Ms. Statz was also set up to fail by not being adequately supported by office staff.  For example, on April 24, 2019, Ms. Statz had 22 patients on her schedule, 19 of which were new.  This was the first time since she joined the practice that she had non-Medicare patients and pediatric patients.  Despite her patient load, she was given only 1 patient room and no dedicated Medical Assistant, which meant she had no support. The staff at the front desk were not rooming her patients in a timely manner and not informing her of cancellations or late patients. It was clear efforts were being made to to intentionally

sabotage her performance by slowing her pace down so that she would get behind and patients and staff would complain.

65.     On Friday April 26, 2019, which was Ms. Statz's day off, she came in to the office to prepare her notes in Word versions to be entered into Caretracker.  One note, that would have taken only a few minutes using EMA, took her an hour and 15 minutes to prepare. When she complained to Dr. Amster about how difficult it was to use Caretracker, and asked if she could continue using EMA, he told her that everyone in the practice had to use Caretracker.  This was not true as she learned that Dr. Brown (a physician in another office of the practice) used EMA at least as recently as April 22, and Dr. Amster used EMA in his other office.  Ms. Statz also learned that other staff at IDG used a medical record system similar to EMA, which she believed was called EDerm.

66.     Ms. Statz told Dr. Amster on several occasions that she believed that his forcing her to switch to Caretracker instead of being able to continue using EMA was done in retaliation for her complaining about pregnancy discrimination, and as a way to either force her to quit or set her up to fail in order to justify terminating her for performance issues.

67.     On May 1, 2019, the PA who had been terminated came by to drop some things off at the office.  She gave Ms. Statz a hug and told her that on her first day of work, Dr. Amster told her not to believe anything Ms. Statz said and not to trust her.

68.     On May 1, 2019, many attempts were made to throw Ms. Statz off her schedule.  Her 8:45 am patient was not roomed until 9:40 am, whereas her 9 am patient was roomed at 9 am, before the 8:45 am patient. Her 11:15 am patient was not roomed at all even though the room was available (room 6 was open).  The patient left frustrated. Her 12:45 pm

patient was not roomed until 1:10 pm.  He had a very complicated third opinion rash, and Ms. Statz did not finish up with him until 1:51 pm.  Ms. Statz asked the Medical Assistant to bring a viral culture swab into the room, and instead the MA brought a bacteria swab.  Her 2:15 pm patient was roomed at 3:23 pm.  One patient cancelled and she was not informed.

69.  On May 2, 2019, Ms. Statz learned that since returning from maternity leave, the Medical Assistants were not printing her notes and putting them in the patients' paper charts.  This was contrary to the practice prior to her going on maternity leave when her EMA paper notes were always included in her patient charts.  Ms. Statz noticed this when seeing a follow up patient.  This meant that her patients' paper charts were not up to date.

70.  May 8, 2019 was another day that Ms. Statz specifically noted that she was not being supported by the front office staff as many of her patients were not being roomed in a timely manner, but were made to wait a long time despite the fact that there were empty rooms they could have been placed in.

71.  On May 9, 2019, Dr. Amster sent Ms. Statz a long email with more criticism of her performance.

72.  On May 10, 2019, Ms. Statz responded to Dr. Amster's email, noting that "none of these things were issues prior to me complaining about how I was treated for being pregnant, taking maternity leave and returning from leave, and it is beyond clear that this is retaliation and downright harassment against me for complaining and seeking legal counsel, and an attempt to find or create a reason to fire me or hope that I will quit."  Ms. Statz then responded to the unfounded criticisms he had made about her.  Ms. Statz also asked why she could not use the EMA system that was more efficient and secure.  She

wrote, "It is clear to me that you orchestrated this to have something to use against me, as there weren't any issues with my notes before.  You and Dr. Brown continue to use EMA in Brighton, please explain this as this too is an IDG practice.  Why is it better for business?  Why hasn't he been forced to use Caretracker?"

73.     In Ms. Statz's email to Dr. Amster on May 10, 2019, she asked for copies of her monthly collection reports and copies of her billing statements.  She pointed out that this was her second request for these documents.  Since her patient load had recently increased, and her compensation was meant to be based on her collections, she wanted to see whether she was now bringing in collections at a rate that was over her guaranteed salary.

74.     In Ms. Statz's email of May 10, 2019, she also pointed out that she felt Dr. Amster was attempting to sabotage her career.

75.     On Monday May 13, 2019, Dr. Amster responded to her email of May 10.  Dr. Amster refused to provide Ms. Statz with any collections or billing records, and did not provide answers to many questions she had raised.  He ended his email with a new directive that he had never required before, "Since you returned from maternity leave, you go to the other end of the office to set up your spot for the day. You are not presenting patients. Although I do review all your notes, I do need to see patients as well. Starting next week, I'd like you to present at least 4 patients to me and I will see them as well."

76.     This directive to present patients to Dr. Amster was demoralizing as this was something that is required of a student in training, and Ms. Statz had never been required to present patients since her training ended.  She did not understand why this was suddenly necessary where she had never had to present patients to Dr. Amster since she was hired,

nor had the other PA.  Ms. Statz feared that he was setting this new requirement in order to scrutinize her to find something to criticize her for.

77.     On Wednesday May 15, 2019, things came to a head.  Ms. Statz noticed that on at least four occasions between 8:36 am and 9:42 am, there were two open rooms with no patients even though she had a full schedule of patients.  At approximately 10:00 am, Dr. Amster asked to see Ms. Statz, and the two of them spoke in the hallway outside rooms 2 and 3.  He told Ms. Statz that Ms. Peterson would show her how to print out billing statements.  Ms. Statz told Dr. Amster that she did not want to be shown how to do it, as that would take her many hours of time. Instead she asked to receive copies.  He refused. Then he told Ms. Statz that he wanted her to start presenting patients to him.  Ms. Statz asked why, as neither she nor the PA who had just been laid off had ever been asked to present patients to him.  Ms. Statz told him that she had never formally presented patients to a physician since she finished her student training, and this was insulting.  She reminded him that she did present patients to him when she had a question about a diagnosis or a treatment plan, but she would not just randomly present patients.  Ms. Statz told him she felt this was retaliatory.  Dr. Amster responded, "Are you refusing?"  Ms. Statz said, "yes."  He then called out to Ms. Peterson, saying "Did you hear that, she is refusing."  Ms. Peterson rounded the corner and said, "Yes, I heard that."

78.     Ms. Statz realized immediately that she had been ambushed and began to panic as she feared he would use this as an excuse to fire her for refusing his request.  One of the clinical assistants overheard the conversation and saw that Ms. Statz was upset.  Ms. Statz stepped into the open clinical station, hyperventilating.  The clinical assistant told

her, "just breathe."  Ms. Statz stood there for a couple of minutes on the verge of tears, shaking and trying to breathe.

79.    During lunchtime, Ms. Statz was pumping breast milk in her office with the door closed when Dr. Amster slid a Corrective Action Notice under her door giving her a written warning claiming she had engaged in unsatisfactory performance and unsatisfactory behavior/conduct.  The warning called Ms. Statz out for being behind on her notes, and stated that "for proper supervision she needed to present some of her patients to him, which she did not."

80.    On May 17, 2019, Ms. Statz responded to the warning explaining that she was behind on her notes because of the extreme difficulties of typing up Word documents for input into the Caretracker system, which Dr. Amster did not have to do since he was able to dictate notes for someone else to input.  Ms. Statz pointed out that being behind on her notes had no relationship to any need to present patients, and that if presenting patients was necessary "for proper supervision," she asked why Dr. Amster had not been requiring that since she began working in July 2018.  Ms. Statz once again reiterated that this criticism of her was retaliatory for her complaints about discrimination and an effort to build a record to justify firing her.

81.    The stressful environment that Ms. Statz had been working in since her return from maternity leave had been building steadily over time.  Ms. Statz was extremely stressed. Her hair was falling out and her breast milk was drying up. She felt sick coming to work every day. She had a new baby at home and two young boys who needed her to be present, but she was unable to focus on her children or her husband.  She couldn't sleep, she was eating poorly, she had no time to exercise. She felt anxious, depressed and had

recurring nightmares about the situation. She lived with the fear every day when she

came to work that she was going to be fired at any moment and her career that she had

worked so hard for would be over.

82.    Ms. Statz made an appointment with a psychiatrist, whom she saw on Friday, May 17,

2019.  She described the extreme stress that she had been under since returning from

maternity leave, the constant scrutiny and criticism she was getting at work and how she

felt she was being set up to be fired.  She explained how she was having difficulty

sleeping, experiencing nightmares, and felt isolated at work.  Ms. Statz told him that she

dreaded coming in to work especially on days that Dr. Amster was present.  She told him

she felt she was being set up for failure and that Dr. Amster was now using patients

against her.

83.    Ms. Statz told the psychiatrist that not only was she stressed out because she was behind

on her notes, but she was also worried that this medical record system was bad for patient

care in general and could be used against her. She felt like she was being trapped and it

was only a matter of time before she had an encounter with a patient that could be twisted

and used to fire her.  She explained that this constant fear was unsettling and affected her

concentration and overall demeanor.  She became irritable, when she was normally very

happy, positive and upbeat. She felt the staff was against her.  They would whisper

behind her back and stop talking when she walked in the room.  Everyone knew that she

had been given a warning, which was humiliating. She explained that she felt that the

entire office was working against her, because staff members were praised when they

would relay negative information to Dr. Amster and Ms. Peterson about her.  She said

that it was beginning to feel dangerous (for patients) for her to continue working in an

environment where she felt she was being sabotaged. Her psychiatrist diagnosed Ms. Statz with PTSD and prescribed medication and therapy.  He recommended that she take a medical leave of absence of one month to get out of the hostile environment she was in and to get treatment.

84.    That same day, May 17, 2019, Ms. Statz sent a letter from her psychiatrist to Dr. Amster putting her out on a one-month medical leave to June 13, 2019.

85.    As June 13, 2019 approached, the fear of returning to work in such a hostile environment and the fear of being fired became almost paralyzing.  Ms. Statz's breastmilk remained scant, her hair continued to thin, she had constant anxiety about the thought of returning to work.  The recurring nightmares persisted. On June 13, 2019, her doctor extended her medical leave by another month fearing that if she returned to the same work environment, her symptoms would continue unchanged.  She sent another letter from her doctor to Dr. Amster and Stuart Sands extending her medical leave for another month to July 13, 2019.

86.    A month later, as the prospect of returning to work loomed once again, Ms. Statz started to experience the same debilitating symptoms as she had experienced in June. Her symptoms had begun to lessen with her medical leave and the treatment she was going through.  But the prospect of returning to work made her physically ill.  She was anxious and fearful for her career and reputation. She saw her doctor on July 12, 2019.  He did not feel that she could return to work without putting her health at risk. She therefore sent an email to Dr. Amster and Mr. Sands on July 15, 2019 resigning her employment.

87.    On July 17, 2019, Ms. Statz sent Dr. Amster and Mr. Sands a letter from her psychiatrist supporting her need to resign, which stated:

I have seen Mrs. Lisa Statz in my Outpatient Clinic at Tufts Medical Center on July 12, 2019.  Mrs. Statz's condition and my formulation of it has not changed since my last letter on June 13, 2019. I strongly believe that Mrs. Statz's psychological symptoms would worsen upon exposure to the environment that contributed to the initiation of the symptoms in the first place. Hence, my recommendations are that:

1. Mrs. Statz is to not return to work at this point
2. Mrs. Statz is to continue treatment of her symptoms.

**Exhibit D hereto.**

88.   Ms. Statz began her job search on July 23, 2019.  She received emails from several recruiters over the next few weeks about dermatology jobs she applied for that never went anywhere.

89.   Over the next year, Dr. Amster continued retaliating against Ms. Statz by interfering with her efforts to secure subsequent employment as a Physician Assistant. She found over and over again that a job opportunity would vanish once Dr. Amster's name was mentioned or the time for checking references came.  She also was closed out of any job opportunities with dermatology practices owned by IDG, which had bought up many of the practices in the greater Boston area and south coast of Massachusetts region.

90.   On August 6, 2019, Ms. Statz filed her Charge of discrimination at the MCAD alleging that IDG and Dr. Amster discriminated against her on the basis of her pregnancy and use of maternity leave and retaliated against her because she opposed discriminatory conduct.

91.   On August 30, 2019, Ms. Statz received an email from the office manager at South Coast Dermatology, one of the practices she had sent her resume to directly, requesting a time to talk. In early September 2019, she had an in-person interview with 4 physicians. During the interview, Dr. Susan DeCoste mentioned that she "knew Mark [Amster]and

that they are on the MA Board of Dermatology together." She said there was a meeting coming up and she was going to ask him about Ms. Statz.

92.   On September 11, 2019, Ms. Statz shadowed the physicians at South Coast Dermatology and they requested her references. The conference that Dr. DeCoste mentioned took place several days later.

93.   Around this same time, Ms. Statz met a neighbor who happened to have an appointment at South Coast Dermatology and told Ms. Statz that she was going to speak favorably to the staff at South Coast Dermatology about Ms. Statz.  The next day the neighbor drove by Ms. Statz in her car and rolled down the window, saying "Hi new friend, Lisa. On my way to the dermatologist."  Ms. Statz never heard from her again.

94.   On September 17, 2019, having not heard back from South Coast Dermatology, Ms. Statz sent an email to the office manager, checking in and asking how the reference checks were going.  The office manager emailed her back on September 20, 2019, saying they were still interviewing for the position.  Ms. Statz never heard back.

95.   Around this same time Ms. Statz was interviewing for a position with GK Dermatology, PC, in Weymouth.  The interviewing was going well, she shadowed the physician, Dr. George Kroumpouzos, and she even discussed salary and details about the on boarding process.  But once references were checked, they told Ms. Statz that she was not the right fit.

96.   In November 2019, Ms. Statz corresponded with a recruiter, Lisa Johnson, for a dermatology job. After a few communications, Ms. Johnson emailed Ms. Statz telling her that she would not be able to represent Ms. Statz to the employer, which was IDG, as "they already have you in their system."

27

97.   In January 2020, Ms. Statz responded to another job posting, but once again the recruiter said it was a practice owned by IDG, and therefore she would not be considered.

98.   Ms. Statz became extremely discouraged, knowing that that IDG was buying up many of the dermatology practices in Massachusetts.  She began fearing she might not be able to find a job in dermatology without having to move out of state, which at that time was not an option.

99.   Ms. Statz began to sink into depression.  She found it hard to get up, hard to sleep, hard to take care of herself and her children.  She was anxious and was having nightmares. She suffered from scalp psoriasis, a very itchy condition that contributed to her hair falling out.  She continued to suffer from PTSD.  Her psychiatrist told her that what she was going through was like mourning a death as she was facing the prospect of not being able to find a job in her chosen career.

100.  At that time, in the winter of 2020, Ms. Statz started to look for jobs outside of dermatology. She interviewed at Dana Farber in the melanoma department.  Then COVID hit and Ms. Statz started to look into jobs in telemedicine.

101.  On May 7, 2020, a recruiter for Phynet (which owns dermatology practices), Alex Nagy, reached out to Ms. Statz.  He had several different positions to fill.  Ms. Statz interviewed for a job in their Brookline office, but the attending physician knew Dr. Amster and Ms. Statz never heard from him again.

102.  On August 30, 2020, Ms. Statz got a call from a recruiter for a job she had sent her resume to months before, Plymouth Dermatology Associates. She interviewed with the supervising physician and his partner on Friday, August 31, 2020, and they offered her the job as a Physician Assistant.

103.   After going through the credentialing process, Ms. Statz started her job on October 13,

2020.  She is working 4 days a week, Tuesday-Friday, 8:00 am to about 5:00 pm, with a

base salary of $100,000 and 13% of collections.  While her base is higher, her collections

are lower than what IDG had promised she could earn, and her hours are longer than at

IDG.

104.   IDG has hired a male PA in its Mashpee location, and is currently offering cosmetic

dermatology services in that office.

## COUNT I

**Sex Discrimination based on Pregnancy in Violation of Title VII of the Civil Rights Act of
1964, as Amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e et seq.
Defendant IDG**

105.   Ms. Statz repeats and realleges paragraphs 1 through 104 as though fully set forth herein.

106.   Ms. Statz experienced sex discrimination based on her pregnancy, taking maternity leave

and having a newborn child.

107.   Ms. Statz was not treated in a negative or hostile manner when she first joined IDG.  It

was not until after she informed Dr. Amster of her pregnancy that his attitude, demeanor

and behavior towards her changed.

108.   Dr. Amster told colleagues of Ms. Statz that he was not happy that she was pregnant and

that he hoped she would quit or would not return from maternity leave.

109.   Dr. Amster engaged in conduct towards Ms. Statz that was different from what he had

promised her when he hired her and different from how she was treated before notifying

Dr. Amster of her pregnancy: Dr. Amster failed to provide Ms. Statz with compensation

and terms of employment, including a sufficient patient load to reach the compensation

amount she was promised; not providing a dedicated MA; not providing sufficient staff

support; refusing to provide her with cosmetic dermatology supplies and other supplies

that she requested; not being allowed to develop a cosmetic dermatology practice; and notifying Ms. Statz during her maternity leave that he would not allow her to develop a cosmetic practice, contrary to his assurance in November 2018 that he would.

110.    When Ms. Statz returned from maternity leave, Dr. Amster took steps to force her to quit her job including hiring a new PA and switching Ms. Statz's patients to the new PA; unfairly criticizing her performance and subjecting her to unfair discipline; undermining her ability to do her job; forcing her to use an inefficient and time consuming medical records system; treating her differently from the other PA and other colleagues; and creating a stressful and hostile work environment.

111.    The new PA was not treated in the same hostile manner as Ms. Statz was treated.  For example, the new PA was given a higher patient load when she began; was given patients of Ms. Statz; was given a dedicated MA; and was given a microscope promptly a week after requesting it.

112.    Defendants' hostile treatment of Ms. Statz interfered with Ms. Statz's ability to do her job, interfered with her patient care, and forced her to quit, resulting in a constructive discharge.

113.    By these actions, Defendants have engaged in unlawful sex discrimination (based on pregnancy) and interfered with Plaintiff's rights in violation of Title VII of the Civil Rights Act of 1964 as amended by the Pregnancy Discrimination Act, 42 U.S.C. § 2000e et seq.

114.    As a direct and proximate result of the above described conduct, Ms. Statz has sustained substantial injury, including but not limited to, loss of compensation, emotional distress, attorneys' fees and costs.

**WHEREFORE**, Ms. Statz prays this Court enter a judgment on Count I above against Defendant IDG and award her compensatory damages (including lost wages and benefits, and damages for emotional distress), reasonable attorneys' fees, costs and interest, punitive damages, and such other relief as the Court deems just and proper.

## COUNT II

**Sex Discrimination based on Pregnancy in Violation of M.G.L. c. 151B, §§ 4(1) (sex discrimination, pregnancy), 4(1E) (Pregnant Workers Fairness Act), 4(11A) (Parental Leave Act), & M.G.L. c. 149, § 105D (Parental Leave Act) Defendants IDG and Dr. Amster**

115.   Ms. Statz repeats and realleges paragraphs 1 through 114 as though fully set forth herein.

116.   Ms. Statz experienced sex discrimination based on her pregnancy, taking maternity leave and having a newborn child.

117.   Ms. Statz was not treated in a negative or hostile manner when she first joined IDG.  It was not until after she informed Dr. Amster of her pregnancy that his attitude, demeanor and behavior towards her changed.

118.   Dr. Amster told colleagues of Ms. Statz that he was not happy that she was pregnant and that he hoped she would quit or would not return from maternity leave.

119.   Dr. Amster engaged in conduct towards Ms. Statz that was different from what he had promised her when he hired her and different from how she was treated before notifying Dr. Amster of her pregnancy: Dr. Amster failed to provide Ms. Statz with compensation and terms of employment, including a sufficient patient load to reach the compensation amount she was promised; not providing a dedicated MA; not providing sufficient staff support; refusing to provide her with cosmetic dermatology supplies and other supplies that she requested; not being allowed to develop a cosmetic dermatology practice; and notifying Ms. Statz during her maternity leave that he would not allow her to develop a cosmetic practice, contrary to his assurance in November 2018 that he would.

120. When Ms. Statz returned from maternity leave, Dr. Amster took steps to force her to quit her job including hiring a new PA and switching Ms. Statz's patients to the new PA; unfairly criticizing her performance and subjecting her to unfair discipline; undermining her ability to do her job; forcing her to use an inefficient and time consuming medical records system; treating her differently from the other PA and other colleagues; and creating a stressful and hostile work environment.

121. The new PA was not treated in the same hostile manner as Ms. Statz was treated. For example, the new PA was given a higher patient load when she began; was given patients of Ms. Statz; was given a dedicated MA; and was given a microscope promptly a week after requesting it.

122. Defendants' hostile treatment of Ms. Statz interfered with Ms. Statz's ability to do her job, interfered with her patient care, and forced her to quit, resulting in a constructive discharge.

123. By these actions, Defendants have engaged in unlawful sex discrimination (based on pregnancy) and interfered with Plaintiff's rights in violation of M.G.L. c. 151B, § 4(1).

124. By these actions, Defendants have violated the Pregnant Workers Fairness Act, M.G.L. c. 151B, § 4(1E), which prohibits an employer from taking adverse action against an employee due to her pregnancy or a condition related to her pregnancy including leave to recover from childbirth.

125. By these actions, Defendants have violated the Parental Leave Act, M.G.L. c. 149, § 105D and M.G.L. c. 151B, § 4(11A), which prohibits an employer from taking adverse action against an employee for using parental leave.

126.    As a direct and proximate result of the above described conduct, Ms. Statz has sustained

substantial injury, including but not limited to, loss of compensation, emotional distress,

attorneys' fees and costs.

**WHEREFORE**, Ms. Statz prays this Court enter a judgment on Count II above against

Defendants IDG and Dr. Amster and award her compensatory damages (including lost wages

and benefits, and damages for emotional distress), reasonable attorneys' fees, costs and interest,

punitive damages, and such other relief as the Court deems just and proper.

<u>**COUNT III**</u>

**Retaliation Under Title VII of the Civil Rights Act of 1964,
42 U.S.C. § 2000e et seq., Defendant IDG**

127.    Ms. Statz repeats and realleges paragraphs 1 through 126 as though fully set forth herein.

128.    At all times Ms. Statz performed her job with a high level of skill, professionalism and

attention to detail.

129.    Ms. Statz complained about pregnancy discrimination on a number of occasions,

including to Dr. Amster on November 3, 2018 (telephone), March 11, 2019 (email), and

to Mr. Sands on March 27, 2019 (meeting).  Ms. Statz complained about retaliation many

times after she returned from maternity leave to Dr. Amster and Mr. Sands including to

Mr. Sands on April 2, 2019 (meeting), April 4, 2019 (email), May 10, 2019 (email), May

15, 2019 (meeting), and May 17, 2019 (email).

130.    After Ms. Statz returned from maternity leave, Defendants retaliated against her by taking

negative actions against her including unjustified criticism of her performance, subjecting

her to unfair discipline, interfering with her ability to do her job, setting her up to fail,

requiring her to use an antiquated electronic medical system that others did not have to

use, overloading her with patients on certain days and then intentionally sabotaging her

schedule so that she would fall behind, not providing proper support, ostracizing her, and creating a stressful and hostile work environment that would force her to quit.

131.   Defendants further retaliated against Ms. Statz by interfering with her ability to obtain subsequent employment by, among other things, providing negative references so that she would not be offered job opportunities.

132.   By engaging in negative job actions and interfering with Ms. Statz's ability to do her job and by interfering with her ability to obtain subsequent employment, Defendants unlawfully retaliated against Ms. Statz.

133.   By these actions, Defendants engaged in unlawful retaliation and interfered with Ms. Statz's rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

134.   As a direct and proximate result of the above described conduct, Ms. Statz has sustained substantial injury, including but not limited to, loss of compensation, emotional distress, attorneys' fees and costs.

**WHEREFORE**, Ms. Statz prays this Court enter a judgment on Count III above against Defendant IDG and award her compensatory damages (including lost wages and benefits, and damages for emotional distress), reasonable attorneys' fees, costs and interest, punitive damages, and such other relief as the Court deems just and proper.

## COUNT IV

### Retaliation in Violation of M.G.L. c. 151B, §§ 4(4) & 4(4A)
### Defendants IDG and Dr. Amster

135.   Ms. Statz repeats and realleges paragraphs 1 through 134 as though fully set forth herein.

136.   At all times Ms. Statz performed her job with a high level of skill, professionalism and attention to detail.

137.    Ms. Statz complained about pregnancy discrimination on a number of occasions, including to Dr. Amster on November 3, 2018 (telephone), March 11, 2019 (email), and to Mr. Sands on March 27, 2019 (meeting).  Ms. Statz complained about retaliation many times after she returned from maternity leave to Dr. Amster and Mr. Sands including to Mr. Sands on April 2, 2019 (meeting), April 4, 2019 (email), May 10, 2019 (email), May 15, 2019 (meeting), and May 17, 2019 (email).

138.    After Ms. Statz returned from maternity leave, Defendants retaliated against her by taking negative actions against her including unjustified criticism of her performance, subjecting her to unfair discipline, interfering with her ability to do her job, setting her up to fail, requiring her to use an antiquated electronic medical system that others did not have to use, overloading her with patients on certain days and then intentionally sabotaging her schedule so that she would fall behind, not providing proper support, ostracizing her, and creating a stressful and hostile work environment that would force her to quit.

139.    Defendants further retaliated against Ms. Statz by interfering with her ability to obtain subsequent employment by, among other things, providing negative references so that she would not be offered job opportunities.

140.    By engaging in negative job actions and interfering with Ms. Statz's ability to do her job and by interfering with her ability to obtain subsequent employment, Defendants unlawfully retaliated against Ms. Statz.

141.    By these actions, Defendants engaged in unlawful retaliation against Ms. Statz for opposing discriminatory practices and interfered with Ms. Statz's rights in violation of M.G.L. c. 151B, §§ 4(4) & 4(4A).

142.   As a direct and proximate result of the above described conduct, Ms. Statz has sustained substantial injury, including but not limited to, loss of compensation, emotional distress, attorneys' fees and costs.

   **WHEREFORE**, Ms. Statz prays this Court enter a judgment on Count IV above against Defendants IDG and Dr. Amster and award her compensatory damages (including lost wages and benefits, and damages for emotional distress), reasonable attorneys' fees, costs and interest, punitive damages, and such other relief as the Court deems just and proper.

## COUNT V

### Tortious Interference with Prospective Employment Defendant Dr. Amster

143.   Ms. Statz repeats and realleges paragraphs 1 through 142 as though fully set forth herein.

144.   Ms. Statz began her job search in July 2019.

145.   Ms. Statz filed her discrimination and retaliation claims with the MCAD on August 6, 2019.

146.   Dr. Amster was aware that Ms. Statz was seeking subsequent employment as a PA.

147.   In the fall of 2019, Ms. Statz interviewed for a PA job at South Coast Dermatology.  One of the physicians told Ms. Statz that she knew Dr. Amster and that they served are on a board together.  She said there was a meeting coming up and she was going to ask him about Ms. Statz. After references were checked and the conference occurred, no one got back in touch with Ms. Statz about the job.  Ms. Statz emailed South Coast Dermatology on September 17, 2019 to find out the status of her job application and was told that the practice was still interviewing for the position.  She never heard from South Coast Dermatology again.

148.    In the fall of 2019, Ms. Statz interviewed for a PA position with GK Dermatology in Weymouth.  The interviewing was going well, she shadowed the physician for a day, and she even discussed salary and details about the on boarding process.  But once references were checked, they told Ms. Statz that she was not the right fit.

149.    In May 2020, Ms. Statz interviewed for a job in the Brookline office of Phynet, which owns a number of dermatology practices.  The attending physician told Ms. Statz that he knew Dr. Amster.  Ms. Statz never heard from this practice again.

150.    Dr. Amster intentionally interfered with Ms. Statz's prospective economic relationship with several medical practices with actual malice, specifically in retaliation for Ms. Statz opposing discriminatory practices and filing a complaint of discrimination and retaliation at the MCAD.

151.    As a result of Dr. Amster's unlawful interference with Ms. Statz's prospective economic relationships with several medical practices, she has suffered economic and emotional harm.

**WHEREFORE** Ms. Statz prays this Court enter a judgment on Count V above against Defendant Dr. Amster and award her all tort damages including actual damages (including any lost wages, lost benefits, and damages for loss of professional opportunities and reputation, and emotional distress), and such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all counts so triable.

Respectfully Submitted,
By Her Attorneys

*/s/ Justine H. Brousseau*
Justine H. Brousseau   BBO# 553776

Nina Joan Kimball      BBO# 547567
Kimball Brousseau LLP
One Washington Mall, 7th Floor
Boston, MA  02108
(617) 367-9449
jbrousseau@kbattorneys.com
DATED: December 16, 2020        nkimball@kbattorneys.com